Higgins *vs.* Whitson and Willetts, ex'rs, &c. and others.

On the 25th of July, 1838, C. made a general assignment of all his property to W. and N., in trust to sell and convey so much real estate as should be sufficient to pay his debts, and to apply the rents and profits to his support during life. C. was infirm and in debt, and incapable of managing his own affairs at the time of making the assignment. The trustees subsequently sold a portion. of the assigned property, called "the Bayside Farm," to S. W. for $15,000, with the knowledge and assent of C., the assignor, and executed a deed to him, in which C. joined. No part of the purchase money was paid, but the purchaser gave his bond for the amount, payable at a future day. The debts not exceeding $80,000, C. consented to the sale only on condition that the trustees could find an opportunity to invest the surplus remaining after paying the debts. The trustees accordingly loaned to H. $6000 upon real estate at Newburgh, which sum S. W. consented to advance towards the purchase money, before he obtained possession. The property mortgaged by H. was subject to a prior mortgage of $4000, and was valued at $16,000. C. knew of, and consented to, this loan to H. Subsequently C. died, and the trustees delivered over to B. W. S., his executor, the bond and mortgage taken from H. The executor took no measures to enforce the payment of the interest, or the principal, from H. The prior mortgage was foreclosed, and after satisfying the same, there was a surplus of $4956.84, which B. W. S. applied for, and obtained, upon H.'s bond and mortgage; leaving due, for principal and interest, to the estate of C. $2502.73; for which a decree in chancery was obtained against H., which still remained due and unpaid. In an action brought by the devisees of C. against the trustees, to recover the amount of that deficiency from them; *Held*, that the trustees had not been guilty of any dereliction of duty, either in selling the property, or in loaning the money to H.; and that consequently they were not liable for the loss which had occurred.

It cannot be expected from trustees that they should act upon principles different from those which actuate cautious and prudent men in the transaction of their own affairs. Otherwise, the office of a trustee would be one of such hazardous responsibility that no prudent or competent man would ever accept it. Per Clerke, J.

IN EQUITY. This action was brought by Susan Higgins and Ann Higgins, an infant, now deceased, by her next friend, the said Susan Higgins, in the late court of chancery, before the chancellor, against John Nostrand, Thomas Whitson and Edmund Willetts, executors of Thomas Whitson, deceased, and Benjamin W. Strong, executor of the last will and testament of Charles P. Cornwall, late of the town of Flushing, de-

ceased, to recover certain moneys alleged by the complainants to have been lost by the negligent or fraudulent acts of the said John Nostrand and Thomas Whitson, deceased, while acting as trustees of the said Charles P. Cornwall. The bill was filed by the complainants as devisees of the said Charles P. Cornwall. The bill of complaint was filed on the 11th day of May, 1847. All the defendants, except the said Benjamin W. Strong, appeared, and put in answers to the bill of complaint. The answers were filed September 1st, 1847. The bill was taken as confessed by the said Benjamin W. Strong, for want of an appearance. The said Benjamin W. Strong departed this life in the month of September, 1847. Replications to the answers were filed October 2d, 1847. The complainants filed their bill of revivor and supplement in the supreme court in equity, September 23d, 1848, against the said defendants, who had appeared and answered the original bill, whereby this action was revived against the said Daniel T. Smith, as the administrator with the will annexed, of the said Charles P. Cornwall, deceased, and who was made a defendant therein. The defendants, Nostrand, Whitson and Willetts, appeared and filed their answers to the bill of revivor and supplement on the 31st day of October, 1848. Replications thereto were filed November 6th, 1848. Said bill was taken as confessed against the defendant, Daniel T. Smith, for want of an appearance. The cause was at issue on the pleadings, November 27, 1848. Testimony in the cause was taken by consent of parties, complainants and defendants, before John P. Rolfe, Esq. and William Templeton Johnson, Esq. referees duly appointed for that purpose. The cause was heard and tried in December, 1852, before Philo T. Ruggles, Esq. as sole referee, therein duly appointed by an order of this court, bearing date September 6th, 1852, upon the pleadings and proofs taken before said referees. The said Philo T. Ruggles, as such referee, made his decision and report herein, bearing date January 27th, 1853, in favor of the respondents, and against the said appellants, John Nostrand, Thomas Whitson and Edmund Willetts, executors as aforesaid. That report was filed with the clerk of this court on the 30th day of March, 1853,

and thereupon judgment was rendered in favor of the complainants against the defendants in the sum of $3904.25, with interest from the 27th day of January, 1853, besides their costs in this action to be taxed; from which judgment Nostrand, Whitson and Willetts duly appealed to the general term of this court, on the 15th day of April, 1853.

*H. B. Cowles* and *John A. Lott*, for the appellants.

*G. T. Strong* and *M. S. Bidwell*, for the respondents.

CLERKE, J. ' Charles P. Cornwall, now deceased, made a general assignment, dated 25th of July, 1838, to Thomas Whitson, deceased, and John Nostrand, in trust to sell and convey so much real estate as should be sufficient to pay his debts, and to lease any part of the land, and apply the rents and profits to his support during life. Cornwall was infirm, and in debt; and being incapable from bad health of attending efficiently to his affairs, he placed his property under the control of two neighbors,. Whitson and Nostrand, who seem to have been actuated by kind and disinterested motives in accepting this trust. The land which was assigned consisted of several tracts in Queens county; that called " the Bayside Farm," was the most valuable—its value considerably exceeding the whole indebtedness of Cornwall.

The trustees made efforts to sell other portions of the estate; but, notwithstanding strenuous and faithful exertions, they failed in this attempt; and, at last, having received an offer from Samuel Willetts, of the city of New York, a man of wealth and high credit, for the Bayside Farm, for the sum of $15,000, they sold it to him for this sum. This was done with the full knowledge and consent of Cornwall. The trustees executed a deed to Willetts about the 23d of November, 1838, in which Cornwall joined. Willetts did not then pay any part of the purchase money, but gave to the trustees his personal obligation, without security, to pay the amount on the 1st of April, 1840, or on the 1st of April, 1839, in case possession of the premises

should be given before that time. It having been ascertained that the debts did not exceed $8000, and Cornwall, before he consented to the sale to Willetts, having expressly stated that he would not be willing to sell the Bayside Farm, unless the trustees could find an investment for the surplus after paying the debts, they received an application for a loan of $6000, from Elisha Hall, of Newburgh. Mr. Cornwall consented to this loan; and, as Willetts was willing to advance this amount of the purchase money of the Bayside Farm, before he received possession, they had the title to Hall's property examined, and found it to correspond with his representations. This security was estimated at $16,000. There was one mortgage on it for $4000, besides judgment liens. The latter were paid off on the day the trustees made the loan, leaving the $4000 to remain as a prior incumbrance. It does not appear satisfactorily that Cornwall was aware of the first mortgage; but he expressed a preference for a farm in the country to property in the city of New York, confiding in the judgment and integrity of the trustees, especially Mr. Whitson, who took the most active part in this business. About the 26th of November, 1838, Hall executed the bond and mortgage to the trustees, payable on the 1st of May, 1840.

Cornwall died on the 4th of February, 1839; and soon after his death, the trustees delivered over to Benjamin W. Strong, his executor, the security in question without an assignment in writing. No interest money on this security was in arrear at this time; and, *after it came into the hands of the executor*, it continued to be regularly paid, until the 1st of May, 1841, some time after the principal became due. After this time no interest was paid on this or the prior mortgage, until the foreclosure of the latter in 1844. Strong, the executor, took no measures to enforce the payment of the interest or the principal. After satisfying the first mortgage, the surplus remaining was $4936.84, which Strong as executor applied for and obtained upon the bond and mortgage of Hall to the trustees, leaving due for principal and interest, the sum of $2502.73, for which a de-

Higgins *v.* Whitson.

cree in chancery was obtained against Hall on the 21st October, 1844, and which is still due and unpaid.

This action is brought to recover the deficiency, from the trustees. Have they been guilty of any dereliction of duty either in selling the property, or in lending the money to Hall? This may be considered rather an agency, than a trust in the ordinary or technical sense. The fiduciary estates, for which the stringent rules of courts of equity have been particularly intended, and to which their vigilance has been directed, are not those in which the grantor and *cestui que trust* are one and the same person, retaining and exercising control over the property. In the present case the grantor, at all events, at any time after the payment of the debts, could revoke the authority of the trustees, and rescind the conveyance, as to its prospective effect. Indeed this instrument differs, practically, very little, if at all, from a power of attorney, executed by a person in the place where the duties of the attorney are to be performed, and where the property is situated. Temporary convenience seemed to be the motive of the grantor in executing this instrument; he was infirm physically, necessarily confined to his house; and two of his friends, immediate neighbours, kindly undertook to manage his affairs, for the purpose of extricating his property from debt, and relieving his mind from anxiety and trouble. No other motive whatever seems to have influenced the minds of any of the parties to this instrument. If it can be called a trust in the technical sense, there was no *cestui que trust* but Mr. Cornwall himself. He was, no doubt, a man of intemperate habits; and his mind like that of every person who is addicted to such habits, was to some extent impaired; but not in such a degree, as to render him incapable of comprehending his own interest, and of deciding, as correctly as the generality of men, upon the subjects in relation to which he was consulted by the trustees. His preference for farms, over city property, differs from the opinion of most well informed and shrewd capitalists; but, it may, nevertheless, be well doubted, whether a farm, situated in a populous neighborhood and near several great thoroughfares, is not safer for a permanent investment than any

city property. The value of real estate fluctuates wonderfully in a city like New York, and even in the oldest cities. A street which may be this year the mart of business, or the most fashionable locality for private residences, may in ten years fall into disrepute, and depreciate more than one-half in value. There are numerous instances of this in the history of New York; we have all been witnesses of such within the last twenty years. An article in Household Words for May, entitled " Gone to the dogs," shows, in an interesting manner, how an entire street in the great British metropolis often falls into decay within a few years—how it " goes to the dogs."

Some portion of the evidence undoubtedly shows that Cornwall was a man of " low mental capacity;" but this does not prove that his assent to the acts of the trustees was not given freely and intelligently. He died on the 4th of February, 1839; Haughworth lived with him for four months previous to and until his death; and he states, positively, that " Cornwall could converse with Mr. Miller or any body else, as well as any person, before his last illness." The investment was made in Nov. 1838. But even if his mental feebleness may be deemed so great as to leave him at the mercy of every designing person, did the trustees, in fact, take advantage of his weakness, and for any sinister purpose of their own or of others, betray the confidence which he had reposed in them ? I cannot find a particle of evidence to warrant any conclusion of this kind. I cannot even perceive that there was any thing equivocal in their conduct; nor can I find any proof of such neglect or mismanagement as to warrant this court in making them responsible for any deterioration in the security, in which a part of the purchase money of Bayside Farm was invested. I do not think that we could do so without a palpable violation of all equitable principles, even if they were trustees in the most technical sense, and they were acting for married women, or infants, or persons totally incapable of judging for themselves. It cannot be expected from trustees, that they are to act upon principles different from those which actuate cautious and prudent men in the transaction of their own affairs. Otherwise, the office of

trustee would be one of such hazardous responsibility that no prudent or competent man would ever accept it. The mere circumstance that the security given by Hale was a second mortgage, is no proof of neglect or mismanagement on the part of the trustees. The property was valued at $16,000 by persons whom they deemed competent; it was in a rich and populous neighborhood, advantageously situated, with a greater probability of improvement than of depreciation; and the first mortgage was only $4000. Cornwall was consulted relative to this investment, and as he preferred country to city security, he readily gave his assent; although it does not appear expressly, that he was at the time informed that there was a prior mortgage on the farm. But we are not to presume that this was designedly concealed from him, or that it was concealed at all. We have as much reason to infer from the attendant circumstances, and from the general conduct of the trustees in relation to this matter, that it was communicated to him, as that it was suppressed. When we further consider that the deficiency for which this action is brought, was caused by the want of diligence on the part of Mr. Strong, the executor of Cornwall, to whom the whole management of the affair was transferred by the trustees, and who assumed the control over it, we can no longer entertain any doubt on the subject.

The report of the referee should be set aside, and the judgment reversed, with costs.

Cowles, J. I concur in the opinion that the judgment should be *reversed.* Upon the facts the defendants should have had judgment; and as all the facts in the case are evidently before the court, there can be no good reason, as far as I can perceive, for sending the parties again before the referee.

The clerk will enter an order reversing the judgment, with costs.

Mitchell, P. J. concurred.

Judgment reversed.

[New York General Term, May 7, 1855. *Mitchell, Clerke* and *Cowles,* Justices.]